(64 South. 903.)

No. 19,818.

BROWN v. ORLEANS GRAVEL & SAND CO.

(March 16, 1914. Rehearing Denied April 13, 1914.)

*(Syllabus by the Court.)*

SHIPPING (§ 86*)—NEGLIGENCE—BURDEN OF PROOF.

In order to recover from a third person damages alleged to have been sustained by reason of the death of another, the plaintiff must show that the death was attributable to some fault or negligence on the part of the person sued.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 343, 353–360; Dec. Dig. § 86.*]

Appeal from Civil District Court, Parish of Orleans; E. K. Skinner, Judge.

Action by Mrs. Ellen Brown against the Orleans Gravel & Sand Company. From judgment for plaintiff, defendant appeals. Reversed and dismissed.

P. M. Milner and George H. Terriberry, both of New Orleans, for appellant. Woodville & Woodville, of New Orleans, for appellee.

### Statement of the Case.

MONROE, J. Plaintiff sues for damages alleged to have been sustained by reason of the death of her husband, and of the failure of defendant to return his body to New Orleans for burial; the facts of the case being as follows, to wit:

Defendant, having occasion to deliver a lot of piles and other heavy pieces of timber at a place or point called Burwood, on the Mississippi river, some five miles above its mouth, entered into a contract with Winston, a stevedore, to land them from the barges in which they were carried down the river; the expectation being that the work would be done by hand, and the agreed price being $150 for the unloading of three barges, Winston to furnish his own labor. Winston was accompanied, on his visit to defendant's office, by the decedent, Orange Brown, who appeared to be interested with him, and Brown engaged seven men, who, with him as foreman, were sent down from New Orleans to the scene of operations. It was then found that the piles could not be landed by hand, and defendant chartered a floating derrick to assist in the work; the idea conveyed by the testimony being that the derrick was operated as an apparatus employed by defendant, and the record being silent as to any modification in the contract with Winston which may have resulted from its employment. The derrick boat being moored at a distance of about 35 feet from the river bank, the barge to be unloaded was brought alongside, skids, consisting of piles 50 or 60 feet long, were extended to the bank, and the unloading was effected by swinging the boom of the derrick over the barge, picking up the piles, one at a time, swinging the boom, with the pile suspended from its end, around to the left, until it reached the skids, upon which it was let down and released. There were four men in the barge whose duty it was to fasten the chain tackle hanging from the end of the boom to the pile, and tell the engineer of the derrick when to hoist, and the other four, including Brown, were stationed on the bank to disengage the tackle from the piles and arrange the latter in order by means of their cant hooks. The work had been going on for seven or eight days, and several hundreds of piles or timbers had been unloaded, when the accident by which Brown lost his life occurred, as follows: The men in the barge had fastened the tackle to a pile, and had called to the engineer to hoist, which he did; and the pile was lifted from the barge and swung around to the shore by the boom; but, in the course of that movement, the butt end went down and the point up, and, whilst the pile was in that position, the chain tackle by which the point end was sustained became detached, according to plaintiff's theory, from the end of the boom, according to defendant's theory, from the pile, and, the point dropping suddenly, the pile shot forward and downward, struck Brown, and killed him.

The allegations of the petition which attribute fault or negligence to defendant in the matter of the accident read as follows:

"That, when her said husband was working on the bank, rolling the piling that had already been deposited on the bank, a large heavy pile was taken up by the derrick and hoisted off the barge and swung over the bank, when, through the defective tackle, one end of the pile fell and struck her husband and killed him, the other end of the pile being swung in the air; that the said pile would be hooked with two large hooks, at points equidistant between the middle * * * and either end, each hook being attached to a strong wire, or hemp, rope, 10 or 15 feet in length, at the end of which was a smaller hook, which would be hooked into an iron ring, fastened to the main tackle that did the hoisting; that these smaller hooks were left unprotected, without any mousing or other safety appliances to prevent them from jumping out of the ring; that one of them jumped out of

the ring, thereby causing one end of the pile to fall, the other end being suspended by the other hook, and the end that fell struck petitioner's husband and killed him."

## Opinion.

The testimony places it beyond dispute that the tackle by which the piles were attached to the derrick consisted of two chains (not wire, or hemp, rope) weighing about 110 pounds each; and, from our reading of the testimony, we infer that, instead of their being "in the end of each chain a smaller hook, which would be hooked into an iron ring fastened to the main tackle," there was, at the end of each chain, a ring or link, whereby the chain was hung upon a large hook 4½ to 5 inches deep, which was attached to a block weighing between 40 and 50 pounds, which, in turn, was attached to the main tackle at the end of the boom. The evidence satisfied the trial judge, and satisfies us, that, with a pile weighing, say, 2,900 pounds suspended, in the manner described in the petition, from the lower ends of the chains, the upper end of one of the chains was not likely to have jumped out of the hook; and, moreover, there is direct evidence to the effect that it did not do so, though there is some conflict in the testimony upon that point. Counsel for plaintiff say, in their brief:

"The accident that resulted in plaintiff's [?] death happened in the following manner: * * * The engineer of the derrick would swing the boom outward, over the barge upon which the piling was loaded, and the men on the barge would fasten the two ends of a chain that hung from a large hook to the pile, at a point equidistant from the middle of the pile."

If, however, there was but a single chain hung by the middle over the single hook, it would seem to be all the more improbable that it should rise 4 or 5 inches out of the hook, so long as the ends were held down by an object weighing nearly a ton and a half. But defendant's superintendent, in his testimony, speaks distinctly of two chains, and says that each of them weighed about 110 pounds, and there is other testimony which leaves no doubt that there were two chains.

The failure of the plaintiff to prove the negligence alleged in the petition would ordinarily be the end of the case, but there was considerable testimony adduced, without objection, as to the duty of the engineer of the derrick in the matter of keeping a lookout for the safety of the men whilst operating that apparatus, and as to the manner in which he discharged that duty; and plaintiff's counsel is of opinion that it has been proved that, but for the engineer's negligence, the accident would not have happened. We are unable to concur in that view.

It is beyond dispute that the men were warned generally and repeatedly that the work was dangerous, and specifically that they must be on the lookout for the piles; and it is also beyond dispute that, whilst there was no sound from the derrick so long as nothing was being done, the moment the engine was started, and the tackle, by which the piles were lifted from the barge, began to tighten, the exhaust of the steam and the rattle of the machinery produced a noise which could be heard for hundreds of yards, and which no one in the vicinity could help hearing. It is true, upon the other hand, that, while it was the duty of the men to keep a lookout for the piles, it was also the duty of the engineer to keep a lookout for the men; and the evidence shows that, even though a pile had been lifted from the barge, and was swinging in the air, and the men had received notice, by means of the noise, he would stop the engine if he found that they were engaged in placing a pile in position, an operation which sometimes occupied as much as 20 minutes.

It is shown, however, that the boom would not, ordinarily, deliver a pile beyond the ends of the skids, and, though it may have been, and probably was, the case that, at the

moment of the accident, Brown, with another man by the name of Robinson, was engaged, with his back to the derrick, in moving or straightening one of the piles that had already been delivered, there is evidence to the effect that, but a few seconds before, he was walking along at a point some 12 or 15 feet beyond the ends of the skids, and there can be no doubt that he was aware, at that time, that the pile was in motion. It appears to us, therefore, that he did not consider himself in any immediate danger, which would have been true enough under ordinary circumstances and but for the unusual behavior of the pile, which, having a length of, say, 60 feet, reached out, as it were, and killed him. Henry Thomas, one of the men who were working with Brown, and who was called as a witness for plaintiff, gave the following, with other, testimony, to wit:

"Q. You men, then, stood on the skidways, or just off the skidways, on the bank of the river, didn't you? A. Yes, sir. Q. And waited for the pile to swing around? A. For him to lower it. * * * Q. Now, when the boom was coming towards you with a piece of piling, what were you doing? A. Some would be letting it down to get it out of the way. Q. Was there anything to keep you from seeing this pile coming towards you? A. No; I was watching for it. Q. Were the other men watching for it also? A. All was watching, except Brown·; he was pushing his end, trying to get it level, and he had his cant hook around the log and tried to push the log back, to lay it level for the next log to have a bed to lay on. * * * Q. Did you know that it was dangerous to stand under that piling? * * * A. Of course, I knew it was dangerous when it was coming around. Yes; I knew it was dangerous. Q. And every time you saw the pile coming around you got out of the way, didn't you? A. Yes; I got out of the way."

We take it, from the testimony thus quoted, and other testimony, that the men, having received one pile, would wait for another, and would move about from the positions occupied by them to what seemed to be safer ones, as occasion required, and that, when the piles were lowered within their reach, they would be on hand to receive them and to straighten them with those already received, as they came down. It seems not unlikely that, just as the pile in question was swinging around, Brown's attention was attracted by a pile already received, which was not lying parallel with the others, and that, being beyond the ends of the skids, and not considering himself in danger, he took his eyes off the swinging pile and directed them to the one that was out of line, a course of action which neither the engineer nor any one else could have anticipated.

Upon the whole, we do not find the engineer at fault in the matter. We may say, in conclusion, that plaintiff and decedent had not been living together for some time prior to the death of the latter, and that a sentence imposed by the criminal court, requiring him to pay $2 per week for her support, had not been complied with for many weeks. She would, however, be entitled to recover something if the decedent had come to his death by reason of the fault·of the defendant, but we do not find that to have been the case. The facts disclosed excuse defendant for its failure to return the body of the decedent to New Orleans. It is therefore ordered that the judgment appealed from be avoided and reversed, and that plaintiff's demand be rejected, and this suit dismissed at her cost in both courts.

PROVOSTY, J., takes no part herein, being absent on account of illness.