91 So.2d 431 (1956)
Frank J. PATE, Plaintiff-Appellee,
v.
WESTERN GEOPHYSICAL COMPANY OF AMERICA, Defendant-Appellant.
No. 8568.
Court of Appeal of Louisiana, Second Circuit.
November 29, 1956.
Simon & Carroll, Shreveport, for appellant.
McClendon & Benton, J. F. McInnis, Minden, for appellee.
AYRES, Judge.
This suit was consolidated with the case of Hulion v. Western Geophysical Company of America, 91 So.2d 435, for the purpose of trial, and by agreement of counsel both cases were submitted for decision upon the merits in the trial court at the same time and on the same evidence. Separate decrees and judgments were entered in each case. In a like manner the cases were argued, briefed and submitted on the appeal in this court.
Plaintiffs separately and individually seek to recover compensation for damages to the water well of each of plaintiffs and for the cracks and breaks in the walls of a hollow tile building of plaintiff Pate and for the cracks and breaks in the walls, foundation and floor of a cinder block building of plaintiff Hulion, alleged to have resulted from the negligence of defendant in the use of explosives while conducting geophysical explorations and observations in the vicinity of plaintiffs' properties. In the alternative, plaintiffs allege liability of defendant irrespective of the fault or negligence in the use of these explosives under the doctrine of absolute liability.
From separate judgments in favor of each of the plaintiffs for $1,750, the defendant has appealed. Each of the plaintiffs has answered the appeal, praying that the award in his favor be increased to $1,950.
It is not disputed that plaintiffs owned the buildings and wells in question; that defendant used explosives in its geophysical operations in the vicinity of said properties; that the depth of the water in the wells decreased since their completion and that cracks, breaks and defects appear in the buildings. The defendant, however, denies there was any causal connection between its blasting operations and the damages complained of by plaintiffs. Defendant also placed at issue the extent and amount of the damages claimed.
Plaintiffs' properties are situated in a rural section about three miles north of Ringgold, Bienville Parish. Pate's building, constructed of hollow tile and used *432 for a cafe, was completed about March 1, 1954, at a cost stipulated to exceed $3,000. Hulion's residence was completed about October 1, 1953, at a cost exceeding $4,000. The water wells of both plaintiffs were producing, before defendant's operations were conducted, ample water supply for the use of plaintiffs and their families and for the restaurant operated by Pate. Immediately following these operations, both wells ceased producing water. For some time no water was had from the Pate well, and at the time of trial, about a year and a half following defendant's operations, its production was far below normal, even after winter rains. The lowering of pipes in the Hulion well succeeded only in clogging the pump and pipes with mud, whereupon the well had to be deepened for water to be obtained. The Pate well had been producing water in abundance for several years, even sufficient to supply, above normal use, water for 30 to 40 head of cattle during the summers.
Prior to defendant's operations of October 21, 1954, plaintiffs' buildings were in good condition. Immediately thereafter the breaks and cracks in the walls, foundation and floor became apparent.
Neither plaintiff had given defendant a permit or permission to conduct its operations on their property. Plaintiff Pate particularly objected to defendant's operations in his vicinity. Two days prior to the explosive operations, Pate requested that his premises, building and well be inspected by defendant's representative prior to the beginning of such operations, which inspection, however, was refused.
The record consists of 428 pages of testimony, 58 photographs and numerous other exhibits. Our learned brother of the district court was ingenious in the development of the particulars and pertinent facts, as disclosed in his written opinion. Our review and painstaking study of the record leads to the conclusion that His Honor's findings were amply supported by the proof contained in the record. Finding no manifest error therein, it appears neither necessary nor important that we detail the established facts in any great particularity.
However, it may be stated that plaintiff Hulion and his wife were away from home at the time the explosives were set off by defendant. Upon returning, the damage to their residence was discovered and it was only through inquiry of their neighbors they learned the cause. Plaintiff Pate was operating his restaurant at the time. He heard the sound of the explosives, felt the building shake, heard the dishes rattle and saw the mortar dust shaken from the walls by the explosion. Notwithstanding that plaintiffs and their wives and a host of other witnesses testified that the buildings were in good condition, free of breaks and cracks, before the explosions, and that immediately thereafter the defects occurred, the defendant contends that the blasting operations conducted by it could not and did not cause the damages of which plaintiffs complained. Two of the witnesses, Bonie Godfrey and Atticus M. Norrel, testifying for plaintiff, recalled the blasting operations and hearing the shots fired and feeling the jar of the vibrations, which they characterized as severe.
The defendant admitted exploding charges of high explosives in quantities of 15 to 20 pounds each within 800 feet of the Hulion residence and within 2,900 feet of the Pate restaurant. Other shots were made of similar size and character in the vicinity but at greater distances from the two buildings.
The defense is based almost exclusively upon expert testimony given by one Dr. Louis Don Leet, no doubt an outstanding authority with respect to seismic operations and phenomena, who was most positive in this opinion that plaintiffs' damages did not result from defendant's operations. From his study of the location of the various shots complained of and from his mathematical *433 calculations and computations, he stated there could not have been enough force from any of them to have damaged either of those structures, referring to plaintiffs' buildings, or the wells. The force and effect of the Doctor's testimony is considerably minimized by the very purpose for which the explosions were made. As explained by him, the purpose of these geophysical operations through the explosive method is to set in motion vibrations in the earth, which vibrations, on reaching masses of rock or other substances, are rebounded and recorded upon instruments on the earth's surface for use in the study and determination of the character, depth and substance of the formations beneath the earth's surface. If these charges are of sufficient intensity and force so as to penetrate deeply into the earth and rebound to the surface, it would appear inconsistent that such explosions could not and would not produce vibrations horizontally. The effect of Dr. Leet's most informative and learned scientific explanations would lead to the conclusion, which he expressed in most positive terms, that defendant's operations could not and did not cause the damages as plaintiffs alleged; but, as opposed to this scientific hypothesis, we are confronted with the fact, overwhelmingly established by the evidence, that the damages occurred immediately following defendant's operations. To ascribe this fact to sheer coincidence would be a speculative and illogical procedure. Again, while it may be said that such testimony establishes the so-called scientific impossibility of the damage resulting from the explosive operations, the fact is that the only reasonable conclusion is that such damage was caused by and is attributable to defendant's operations.
This court had the occasion recently to enter into a rather elaborate discussion of scientific testimony in Redmond v. Ouachita Coca-Cola Bottling Co., Inc., 76 So.2d 553, 557. In the course of that opinion are found these expressions, which are very appropriate in the instant case:
"* * * our appellate courts have, in effect, declared so many times as to obviate the necessity of citation that `It couldn't happen, but it did.'
* * * * * *
"The above impressive array of scientific conclusions would appear to establish a sound basis for the opinion that no bottle of Coca-Cola could explode or burst as the result of abnormal internal pressure, but we know that such a conclusion would be false because, as evidenced by a number of cases in this and other jurisdictions, courts have concluded on the basis of established facts that some Coca-Cola bottles do explode or burst as the result of internal pressure. It is apparent that the reason for the difference between an apparently sound scientific conclusion and one supported by established facts is due to elements and factors which would not ordinarily be demonstrable in the course of even exceptionally thorough scientific experiments, for example, a flaw or weakness in a particular bottle, either resulting from faulty manufacture or the wear and tear of continuous re-use. For this reason we are impelled to reject as inconclusive the result of the experiments which would lead to the erroneous conclusion that Coca-Cola bottles cannot and do not burst or explode as the result of internal pressure.
* * * * * *
"But, again, we point out the fact that the defendant in the above cited case relied upon the impossible establishment of the proposition that a bottle of its beverage could not explode, which would not stand against the establishment of the ultimate fact, as above observed in the court's opinion, that a particular bottle did explode."
Diametrically opposed to defendant's theory and contention is the conclusion reached by the Supreme Court in Fontenot *434 v. Magnolia Petroleum Co., 227 La. 866, 80 So.2d 845, 848, that similar geophysical exploratory operations, where only 10 pound quantities of the explosives were used, approximately one-half of the charges used in the instant cases, did cause similar damages, such as cracks in the walls, ceilings and areas connected with windows and doors and broken concrete foundations and porch floors to buildings located on plaintiffs' premises. The testimony in the Fontenot case revealed facts and circumstances and a method of operation very similar to those existing in the instant case. The court stated:
"Impressed as we are with the unchallenged and unrebutted proof by plaintiffs, we necessarily conclude that the evidence clearly establishes the claim of plaintiffs in that the general and extensive damages to their homes were nonexistent prior to, and were the causal result of, the geophysical operations conducted by defendants. The fact that plaintiffs did not discover these substantial injuries until two days after defendants' operations, or that the homes were of frail or cheap construction (with no substantive proof to support this conclusion) does not in any wise relieve defendants of liability."
Recovery by plaintiff was permitted under the doctrine of absolute liability, the court saying:
"We are unwilling to follow any rule which rejects the doctrine of absolute liability in cases of this nature and prefer to base our holding on the doctrine that negligence or fault, in these instances, is not a requisite to liability, irrespective of the fact that the activities resulting in damages were conducted with assumed reasonable care and in accordance with modern and accepted methods."
A very similar factual situation was presented in Central Exploration Co., Inc., v. Gray, 219 Miss. 757, 70 So.2d 33, wherein the Supreme Court of Mississippi, under the doctrine of absolute liability, allowed damages to a dwelling, resulting from the explosion of dynamite charges of 10 pounds each at a depth of approximately 80 feet below the surface and at distances of some 275 to 450 feet from the dwelling. Thus, again, it was held that damages did result from vibrations produced by appellants' geophysical explorations, notwithstanding the scientific theory urged here that such could not happen.
Significant, too, is the testimony of Cecil C. Tidwell, an employee of the State of Louisiana, produced as a witness for defendant, who testified that his duties required him to be with the geophysical crews when these blasts or explosions were set off, for the purpose of seeing that no explosions were made on the rights of way of State highways nor near State property, such as lakes, forests, bridges, streams and oyster beds, to the end that no damage would be done to such property. This clearly refutes the testimony of defendant's expert to the effect that a causal connection between its operations and the damage to plaintiffs' properties was impossible.
As we have concluded there was no manifest error in the trial court's conclusion as to the question of defendant's liability, we also find that the testimony amply supports his finding as to the quantum of damages. In this connection, it is to be noted that the trial court personally inspected the damage done to plaintiffs' buildings in accordance with stipulation by both plaintiff and defendant. The evidence reveals that plaintiffs personally performed much of the labor in the original constructions.
Various estimates as to the cost of repairs to plaintiffs' buildings were made by witnesses produced by both plaintiffs and defendant. One of defendant's witnesses testified that the repairs to the Pate building would probably result in an expenditure of $200 to $300 and that the repairs on the Hulion building would cost no more than $100. Several of the estimates made by *435 plaintiffs' witnesses were rejected by the court as excessive, some exceeding the original cost of the buildings. For instance, Henry Wood estimated that it would cost $3,350 to repair the Pate building and $3,675 to repair the Hulion building, and that for a reconstruction of the Hulion building $6,272 would be required. Eddie Chance, who did the tile work in the construction of the Pate building, estimated the cost of its repairs would be $3,250. Otis Skains, a carpenter with 22 years' experience, made an estimate of $2,980 on the Pate building. He took into account the necessity of raising the roof to the extent that certain parts of the walls might be removed and rebuilt and then replacing the roof. Skains' estimate of the repairs to the Hulion building was $3,680, due largely because of the broken foundation in four places. Elgie Peevy, a building contractor, was of the opinion that the Hulion house could not be satisfactorily repaired, due to its broken foundation, and that it would be necessary to rebuild. The trial court concluded that these estimates were based on the repair effecting the reconstruction of better buildings than the ones originally damaged.
After hearing the witnesses and personally inspecting the damaged property, the trial court arrived at his conclusions as to the damage done to the buildings and the cost of their repair. It is, of course, a practical impossibility in cases of this kind to establish an award of damages with absolute certainty. An exact method would be to first have the repairs made, but that is not a prerequisite to the institution of an action of this kind. On a situation similar to the one existing here, the Supreme Court, in Brantley v. Tremont & Gulf Railway Co., 226 La. 176, 75 So.2d 236, 239, said:
"When it is clear that a plaintiff has sustained some damages as a result of the fault of the defendant, according to our well settled jurisprudence, his demands will not be rejected merely because he cannot establish exactly the amount suffered. Under such circumstances the court must fix the quantum as best it can and, in this connection, the trial judge is vested with much discretion. Green v. Farmers' Consolidated Dairy Co., Limited, 113 La. 869, 37 So. 858; Wall v. Hardwood Mfg. Co., 127 La. 959, 54 So. 300; Schmidt v. City of New Orleans, 160 La. 281, 107 So. 110; Germann v. 557 Tire Co., Inc., 167 La. 578, 120 So. 13, and Franklin v. Arkansas Fuel Oil Co., 218 La. 987, 51 So.2d 600."
We do not find that the trial court abused his discretion in his assessment of the awards of damages in these cases. They appear neither inadequate nor excessive, and, finding that the evidence amply supports the awards made as a minimum, we find no error and approve the same.
For the reasons assigned, the judgment appealed is affirmed at appellant's cost.
Affirmed.